Charles Prior **HALL** and **WBX** Partners, Plaintiffs–Appellants,

v.

**AQUA QUEEN MANUFACTURING, INC.,**

and

**Water & Wood Corp.,**

and

**Vinyl Products Manufacturing, Inc.,**

and

**Atlanta Vinyl, Inc.,**

and

**Classic Corporation, d/b/a Classic Flotation Sleeping Systems, Inc.,**

and

**Land & Sky, Ltd.,**

and

**United States Watermattress Corporation,**

and

**Easy Rest, Inc., d/b/a Strobel Manufacturing, Defendants–Appellees.**

Nos. 96–1014 to 96–1021.

United States Court of Appeals, Federal Circuit.

Aug. 28, 1996.

Edward S. Wright, Flehr, Hohbach, Test, Albritton & Herbert, Palo Alto, California, argued, for plaintiffs-appellants.

Scott D. Baker, Crosby, Heafey, Roach & May, Oakland, California, argued, for defendants-appellees Aqua Queen Manufacturing, Inc. and Land & Sky, Ltd. With him on the brief, were Ezra Hendon, and Morgan W. Tovey. Of counsel were Peter W. Davis and Valarie Mark.

Roderick G. Dorman, Christie, Parker & Hale, Pasadena, California, argued, for defendant-appellee Water & Wood Corp. With him on the brief, was Syed A. Hasan.

Edouard V. Rosa, Huebner & Rosa, Los Angeles, California, argued, for defendant-appellee Vinyl Products Manufacturing, Inc. With him on the brief, was Harlan P. Huebner.

Stephen E. Blaine, Callahan, Blaine & Williams, Irvine, California, argued, for defendants-appellees Atlanta Vinyl, Inc., Classic Corporation, d/b/a Classic Flotation Sleeping Systems, Inc., and Easy Rest, Inc., d/b/a Strobel Manufacturing. With him on the brief, was Graig R. Woodburn.

John C. Laprade, Laprade & Associates, Washington, D.C., argued, for defendant-appellee United States Watermattress Corporation. With him on the brief, was Steven W. Teppler. Also on the brief was Bruce A. Jagger, Brunton & Jagger, Glendale, California.

Before MICHEL, PLAGER, and CLEVENGER, Circuit Judges.

Opinion for the court filed by Circuit Judge MICHEL. Opinion concurring in the result filed by Circuit Judge PLAGER.

## DECISION

MICHEL, Circuit Judge.

Charles P. Hall and WBX Partners[1] (collectively, Hall) appeal from eight separate decisions of the U.S. District Court for the Central District of California, all issued on August 31, 1995, granting summary judgment in favor of a total of eight accused infringers on the alternative grounds of laches and equitable estoppel. The eight appeals were consolidated and were submitted for decision after oral argument on June 3, 1996. Because the district court correctly applied the Aukerman presumption in seven of the eight suits, and did not abuse its discretion in barring these seven suits on laches grounds, we affirm on laches grounds as to all the appellees except United States Watermattress Corp. (U.S. Watermattress). Because we need not, we do not reach the issue of equitable estoppel in these seven appeals. Finally, because, given the current state of the record, the district court improvidently granted summary judgment in favor of U.S. Watermattress as to both laches and equitable estoppel, we vacate the judgment in Docket No. CV–92–5539 JMI (CTx) and remand the case for further proceedings consistent with this opinion.

## DISCUSSION

*General Background*

Hall is the named inventor and current co-owner of U.S. Patent No. 3,585,356 (the '356 patent), entitled "Liquid Support for Human Bodies." Hall filed the application that matured into the '356 patent in 1969, and the patent itself issued in 1971. Upon issuance, the patent was assigned to Innerspace Environments, Inc. (Innerspace), a waterbed manufacturing and sales company that Hall

co-founded in 1968 or 1969. Waterbeds became very popular and, as their popularity grew, Innerspace grew also. Indeed, Innerspace soon became the largest retail seller of waterbeds in the U.S., owning and operating over 30 retail stores with annual sales over $5 million. The company's primary focus was on promoting the popularity of waterbeds; during the period from 1969 to 1975, Innerspace spent approximately $1.5 million on retail sales advertising in the California market alone.

Soon after the '356 patent issued, the Water Bed Institute, a trade organization, hired patent attorneys to review the validity and scope of the '356 patent. The following report appeared in a letter circulated to Institute members on September 1, 1971: "On the basis of an initial and preliminary analysis of the Hall patent, the patent in question is probably not of major consequence to the water bed industry. The attorneys state that in their opinion it would be inadvisable at this time for members to rush to sign up to pay royalties for use of the patent. The patent is limited in scope, and should not be of major concern to the water bed industry." Other attorney opinion letters reporting the conclusion that the '356 patent was invalid, such as the October 1973 analysis performed for Hodel & Co., were circulated among members of the industry. The belief that the '356 patent was invalid, already widespread in the industry by 1973–74, appears to have been reinforced by Hall's failure to assert it against anyone in litigation during that time period.

Innerspace assigned the '356 patent back to Hall in August 1974.[2] As a result, Hall continuously held sole interest in the patent from 1974, through the date of its expiration in 1988, until its partial assignment to WBX in 1990. In 1976, Hall created the American Waterbed Council (the Council) to fund a national advertising campaign to promote the

---

1. WBX is a California partnership and current co-owner, with Hall, of the patent in suit. Specifically, Hall assigned an undivided 65% interest in the patent in suit to WBX in March 1990, two years after the patent term had expired. WBX appears to be nothing more than an investment group formed to help finance this patent litiga-

tion in return for a share of any damages and/or royalties resulting therefrom.

2. In early 1975, Innerspace began to suffer financial difficulties due to what Hall describes as mismanagement. The company eventually filed for bankruptcy protection in late 1975.

waterbed industry. The Council itself was supported by membership fees that, according to Hall, constituted royalties under the '356 patent. Hall also indicated that, from the mid–70s through the mid–80s, he "repeatedly contacted major players in the [waterbed] industry in an attempt to get their companies to take a license under" the '356 patent. At no time, however, did Hall initiate litigation or, it seems, even threaten litigation. According to Hall, he was both impoverished (and thus unable to afford an attorney's regular fees) and unable to find an attorney willing to represent him in patent infringement actions on a contingency fee basis. In any event, it is clear from the record in these eight appeals that Hall remained a prominent figure in the waterbed industry throughout the 1970s and 1980s.

In February 1985, Hall filed an International Trade Commission (ITC) proceeding against a number of companies to prevent them from importing beds that allegedly infringed the '356 patent. However, Hall quickly abandoned the proceeding. Intex Plastics Sales (Intex), one of the foreign manufacturers named in the ITC proceeding, decided to prevent another such action by filing its own suit against Hall. Thus, in April 1985, Intex filed a declaratory judgment action attacking the validity of the '356 patent; Hall counterclaimed for infringement. The district court held that the patent was invalid, which decision this court reversed in December 1986.

In August 1987, Hall's attorney sent a form licensing letter to approximately 3,000 waterbed manufacturers and related manufacturing and sales concerns. The form letter contained the following critical paragraphs:

Our client believes that you are manufacturing and/or selling waterbeds of a type covered by one or more of the claims of the ['356] patent and/or components which are especially suited for use in such waterbeds.

Our client is willing to consider granting you a license under the patent on very reasonable terms. If, however, you should continue your infringing activities without

a license, our client is prepared to take whatever action may be necessary to enforce his patent rights.

Please let us know promptly if you are interested in a license under the patent. We are docketing this matter for further attention two weeks from the date of this letter in the event that we do not receive a satisfactory response from you.

While all the defendants involved in the appeals at bar received this form letter, some also received similar follow-up letters later in 1987. At least one had also received a similar form letter in 1983 or 1985. In any event, however, none of the eight appellees now before us responded to the form letters or heard from Hall between 1987 and 1991.

The Intex litigation proceeded to trial on remand in 1991. Hall obtained a $6.8 million infringement verdict, which verdict was affirmed on appeal and satisfied in 1992.

Hall filed six of the eight instant suits in 1991, and the remaining two in 1992. The district court granted summary judgment in favor of all the defendants on both laches and equitable estoppel grounds on August 31, 1995. Hall challenges these decisions on appeal.

*Cases Delayed Six Years or More From Notice of Infringement*

In seven of the eight cases before us, the district court concluded that, because Hall either knew or should have known of the accused infringer's allegedly infringing activities six or more years prior to the filing of suit, the accused infringer was entitled to the benefit of a presumption of unreasonable delay and prejudice, the two critical factual predicates for the application of the equitable bar of laches. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1032–41, 22 USPQ2d 1321, 1328–35 (Fed.Cir. 1992) (in banc) (discussing laches bar). In light of the posture of the cases (*i.e.,* summary judgment stage), the district court in effect concluded that, as to each of the seven defendants, no fact finder could reasonably conclude that Hall did not know, or should not have known, of each infringer's activities

for six or more years before filing suit.[3] We discern no error in this conclusion.

Consider, for example, the activities of Atlanta Vinyl, Inc. (Atlanta Vinyl). Atlanta Vinyl began manufacturing waterbed mattresses in 1979. It advertised heavily in trade magazines from the outset of its activities and attended numerous trade shows attended by Hall. Mr. DeHan, Atlanta Vinyl's president, indicated that he met with Hall many times at these shows. Hall contended, however, that he had no notice of the allegedly infringing activities until 1987, at which time he included Atlanta Vinyl in his mass mailing.

The district court rejected this contention on the basis of the ample record evidence of Atlanta Vinyl's pervasive, open, and notorious activities in the industry, an industry in which Hall had already been a central and active figure for at least eight years. The district court thus concluded that Hall knew or should have known of Atlanta Vinyl's activities by 1980, and possibly as early as 1979; both dates are, of course, more than six years prior to 1991, the year Hall filed suit against Atlanta Vinyl. The district court's conclusion as to Hall's notice of infringement, actual or constructive, is well supported in the record. Again, we discern no error in the application of the *Aukerman* presumption of unreasonable delay and prejudice in Atlanta Vinyl's favor. The remaining seven cases wherein the district court concluded that the *Aukerman* presumption applies, each involving comparably conclusive evidence that Hall should have known of the accused infringer's open, notorious, and allegedly infringing activities more than six years prior to filing suit, are likewise free of reversible error on this point.

Having correctly decided to apply the *Aukerman* presumption in favor of each of the accused infringers, the district court went on to consider, and reject, each of Hall's proffered excuses for his lengthy delay—namely, poverty from the mid–1970s until the mid–1980s, his inability to find legal representation during this same period, and the pendency of his litigation with Intex from 1985 until 1992. The court also concluded that each of the defendants had established economic and/or evidentiary prejudice resulting from Hall's unreasonable delay. Finally, the court weighed the equities of applying the bar over Hall's objections of industry-wide conspiracy and willful infringement, concluding in each of these seven cases that application of the laches bar was appropriate under the totality of the circumstances.

■ Hall contends on appeal that the district court (a) misapprehended the mechanics of "bursting the bubble" of the *Aukerman* laches presumption and, as a result, placed too high a burden of coming forward on Hall, (b) erroneously rejected valid excuses for his delay in filing suit, and (c) abused its discretion by applying the equitable bar of laches despite evidence of an alleged industry-wide conspiracy to prevent Hall from enforcing the '356 patent and of willful infringement by all the defendants. We review the district court's application of the laches bar under the "abuse of discretion" standard. *Aukerman*, 960 F.2d at 1039, 22 USPQ2d at 1333–34.

■ The district court does appear to have misapprehended the mechanics of the Aukerman presumption, but in a manner that could have adversely affected the defendants rather than Hall. The court's extended discussion of the defendants' evidence of prejudice suggests that, in the court's view, they bore the burden of coming forward with evidence demonstrating prejudice even while the presumption was in effect. This is incorrect. The *Aukerman* presumption places a burden of production on the patentee. *Id.* at 1037–38, 960 F.2d 1020, 22 USPQ2d at 1332–33. This burden of production relates to both the excusability of the delay and the lack of prejudice resulting from the delay. Importantly, where the patentee fails to meet

---

**3.** A genuine issue of fact precluding summary judgment is shown to exist only where the nonmovant presents evidence such that, if the trial record were the same as the summary judgment record, a fact finder could reasonably find in the nonmovant's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' ").

this burden of production by coming forward with *either* affirmative evidence of a lack of prejudice *or* a legally cognizable excuse for its delay in filing suit, the two facts of unreasonable delay and prejudice *"must* be inferred." *Id.* at 1037, 960 F.2d 1020, 22 USPQ2d at 1332 (emphasis in original). Hall attacks the district court's conclusion that each of the defendants had demonstrated economic and/or evidentiary prejudice by pointing to perceived weaknesses in the affidavits on which the defendants and the district court relied. Such an attack is, of course, unavailing, inasmuch as the defendants could have remained *utterly mute* on the issue of prejudice and nonetheless prevailed. Hall failed to come forward with any evidence demonstrating a lack of prejudice as to any of the defendants, and thus failed to "burst" the *Aukerman* presumption "bubble" with a "no prejudice" lance. The district court's apparent misunderstanding regarding the need to review the strength of the defendants' evidence of prejudice, evidence they need not have presented at all, was harmless error.

■ Hall also failed to present a legally cognizable excuse for his unreasonable delays in filing suit. The Supreme Court made clear long ago that poverty, by itself, is never an excuse for laches purposes. *Leggett v. Standard Oil Co.*, 149 U.S. 287, 13 S.Ct. 902, 37 L.Ed. 737 (1893). *Aukerman* is not—indeed, *cannot* be—to the contrary. In addition, although poverty may be considered as a factor where there is some legally cognizable excuse for an unreasonable delay, *Frank F. Smith Hardware Co. v. S.H. Pomeroy Co.*, 299 F. 544, 546–47 (2d Cir.1924), no cognizable excuse has been offered in the instant case. A patentee's inability to find willing counsel, another of Hall's excuses, is widely rejected as a legally cognizable reason to excuse an unreasonable delay in filing suit. *See, e.g., Naxon Telesign Corp. v. Bunker Ramo Corp.*, 686 F.2d 1258, 1261 (7th Cir. 1982); *Wafer Shave Inc. v. Gillette Co.*, 857 F.Supp. 112, 120 (D.Mass.1993), *summarily aff'd,* 26 F.3d 140 (Fed.Cir.1994) (table); *Coleman v. Corning Glass Works,* 619 F.Supp. 950, 954 (W.D.N.Y.1985), *summarily aff'd,* 818 F.2d 874 (Fed.Cir.1987) (table). Indeed, Hall presents no authority whatsoev-

er for the proposition that his inability to find a lawyer willing to represent him in an infringement suit on a contingency fee basis excuses his otherwise unreasonable delay.

■ Finally, Hall contends on appeal, as he did before the district court, that any delay in bringing suit is excused by his involvement in the litigation with Intex beginning in 1985. In each of these seven cases, the district court properly concluded that the alleged infringer was aware of the Intex litigation because it was well publicized in the waterbed industry. The district court also concluded, however, that Hall could not rely on the litigation as an excuse for his delay in filing suit because he had not informed any of the accused infringers now at bar that he intended to sue them after the conclusion of his suit with Intex. In so holding, the district court cited *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.2d 1544 (Fed.Cir.), *cert. denied,* 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988). Hall contends that such notice was unnecessary, relying on our statement in *Aukerman* that "there can be no rigid requirement in judging a laches defense that such notice must be given." 960 F.2d at 1039, 22 USPQ2d at 1334 (emphasis in original). We are not persuaded. First, there is no indication that the district court understood there to be a "rigid requirement" of notice. Second, as the section of *Aukerman* from which Hall selectively quotes goes on to say, "[w]here there is prior contact [between the patentee and the accused infringer], the overall equities may require appropriate notice, as in *Jamesbury.*" *Id.* We discern no abuse of discretion in the district court's conclusion that notice of an intent to sue after the *Intex* litigation was required on the facts of this case.

With respect to the final weighing of the equities and application of the laches bar, Hall contends that the district court abused its discretion by providing any of the defendants the benefit of an equitable defense such as laches. According to Hall, the willful nature of the defendants' alleged infringement and the "industry-wide conspiracy against him and his patent" make the application of laches improper. *See id.* at 1036, 22

USPQ2d at 1331 ("Where there is evidence of other factors which would make it inequitable to recognize the defense [of laches] despite undue delay and prejudice, the defense may be denied."). The trial court rejected these same assertions as to all eight defendants. We see no abuse of discretion in this conclusion.

■■■■■■ The test of willful infringement is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *State Indus., Inc. v. Mor–Flo Indus., Inc.,* 883 F.2d 1573, 1581, 12 USPQ2d 1026, 1032 (Fed.Cir.1989). The defendants contend, each in their own way, that the industry-wide belief in the invalidity of the '356 patent (based on widely circulated opinion letters or opinion letter summaries) from late 1971 forward, combined with Hall's failure to sue on the '356 patent from its issuance in 1971 until his ITC action against importers in 1985, justified a reasonable belief on their part "that a court might hold the patent invalid." In addition, as a number of the defendants note, there is no absolute requirement that a would-be defendant aware of another's patent obtain its own opinion letter in order to immunize itself from a finding of willful infringement. *See Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565, 1579 (Fed.Cir. 1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987) (failure to obtain advice of counsel does not mandate a finding of willfulness). Here, too, reliance on opinion letters to others that raised doubts about the '356 patent's validity was proper. As a result, the appellees contend, Hall's allegations of willful infringement are only weakly supported and certainly do not justify refusing to apply an otherwise-proper defense of laches. We agree. In any event, for the district court to so conclude did not constitute an abuse of discretion.

■■■■ As for Hall's allegations of an industry-wide conspiracy, the appellees assert that the most Hall's evidence shows is that members of the waterbed and associated industries, acting through their various trade associations, reached the same view as to the invalidity of the '356 patent. Their decisions not to take licenses have not been demonstrated to result from an illegal conspiracy, and thus must be viewed as business decisions based on their respective views of Hall's power (or lack thereof) over competitors in the market. Importantly, there is no allegation, much less evidence, supporting the notion that any of the defendants or other members of the waterbed industry engaged in illicit activities aimed at wrongfully depriving Hall of his patent rights. As a result, neither of Hall's contentions regarding the district court's final weighing of the equities on laches is persuasive. Certainly, the district court's weighing of the equities was within its discretion, *i.e.,* was not manifestly unreasonable. The decisions in these seven appeals must therefore stand.

## U.S. Watermattress

### General Background

Unlike the other seven defendants, U.S. Watermattress did not begin to manufacture waterbeds until 1983 and did not begin participating in trade shows until 1984 and 1985. The parties agree, however, that Hall has known Bruce Alexander, the president of U.S. Watermattress, since 1976. U.S. Watermattress, relying in part on this personal relationship, contended before the district court that Hall had notice of its accused activities no later than 1984 because (a) Alexander met Hall at trade shows every year from 1977 through 1987, and (b) U.S. Watermattress began displaying the accused products at these shows from 1984 onward. Hall contended that he did not see Alexander at trade shows in 1984 or 1985 and that he had no notice of the allegedly infringing activities until 1987, shortly before he included U.S. Watermattress in his mass mailing.

In light of the above evidence, the district court concluded that "[a]lthough it is unlikely that Hall only learned of the infringing activity five years before he filed suit in light of his twenty-year acquaintance with Alexander, Hall has raised a triable issue of fact." The district court therefore held that the *Aukerman* presumptions of unreasonable delay and prejudice did not apply in favor of U.S. Watermattress. We share the district court's

view on the presence of a triable issue of fact as to when Hall knew or should have known of U.S. Watermattress' allegedly infringing activities.

*Laches*

■ *1. Unreasonable delay.*—Although the district court properly concluded that U.S. Watermattress bore the burdens of both production and persuasion regarding the unreasonableness of Hall's delay in bringing suit, the district court appears to have analyzed the evidence, such as it was, as if Hall bore these burdens. Specifically, we find no support in the record for the district court's conclusion that U.S. Watermattress "provided sufficient evidence for the Court to find that Hall's delay in suing was unreasonable and inexcusable."

In fact, the district court failed to point to a single piece of affirmative evidence tending to prove that Hall's delay was unreasonable. Indeed, a review of the documents submitted by U.S. Watermattress indicates that such evidence does not exist in the record before us. Rather, both at the district court and here on appeal, U.S. Watermattress presented evidence going only to Hall's alleged knowledge of the infringing activities and the alleged prejudice caused by Hall's delay. Absent is the type of affirmative proof that would require a finding that Hall unreasonably delayed bringing suit.

In light of this lack of conclusive evidence, Hall was under no obligation to excuse his delay. However, the district court appears to have found in favor of U.S. Watermattress only because Hall failed to adequately excuse his delay. For example, the district court concluded that Hall could not rely on his ongoing litigation with Intex to excuse his delay in bringing suit because he had failed to give U.S. Watermattress notice that he intended to sue it at the conclusion of that litigation. This conclusion, arguably appropriate in a case where the accused infringer enjoys the benefit of the *Aukerman* pre-

sumptions, is an abuse of discretion in this instance. U.S. Watermattress did not come forward with sufficient evidence to prove that it lacked notice of Hall's intent to sue after the close of the *Intex* litigation,[4] or, assuming it lacked such notice, that Hall's failure to inform it of his intent to sue later made his delay, although short of the six year statute of limitation, still unreasonable and inexcusable.

Thus, as U.S. Watermattress did not carry either its burden of production or of proof with regard to the unreasonableness of Hall's delay, a grant of summary judgment in its favor is in error. Indeed, our conclusion is reinforced by the district court's reliance on an erroneous premise. Specifically, although the *Intex* litigation did not begin until 1985, the district court determined that Hall could have sued U.S. Watermattress at least two years prior to that suit, *i.e.*, in 1983. There is no evidentiary basis for this conclusion. Moreover, this determination conflicts with the district court's recognition elsewhere that Hall raised a genuine issue of fact regarding whether he knew or should have known of U.S. Watermattress' accused activities prior to 1987. Given Hall's success at preventing an adverse summary judgment with respect to his knowledge of the accused activities prior to 1987, we think it error to hold him accountable for any delay prior to that time.

■ *2. Prejudice.*—The district court also determined that U.S. Watermattress had demonstrated that it would be prejudiced, on both economic and evidentiary grounds, if Hall were allowed now to maintain an infringement suit filed in 1992. In support of its claim of evidentiary prejudice, U.S. Watermattress submitted numerous declarations stating that witnesses who could have testified as to validity and infringement no longer have documents needed for their testimony, and that the memories of these witnesses have faded. In addition, Alexander claimed that, when U.S. Watermattress moved into a larger factory in 1984, he destroyed records

---

4. U.S. Watermattress relied primarily on Alexander's declaration that Hall told him in the 1970s that Hall would not sue under the patent. Hall denied ever telling Alexander this, creating a genuine issue of material fact. In any event, even if Hall did make such a statement, U.S.

Watermattress cited no evidence of any later communications, and thus, failed to demonstrate why it was entitled to rely on such a statement some ten years later in the face of two notice letters and the fact that Hall had begun enforcing his patent.

that may have contained invalidating prior art; similarly, U.S. Watermattress submitted declarations of three additional individuals who claimed to have knowledge of potentially invalidating prior art but who had not maintained their records. Regarding economic prejudice, Alexander stated that U.S. Watermattress had expanded its plant size and financial commitment three times by 1988.

Hall contends on appeal that U.S. Watermattress failed to offer any evidence to demonstrate a causal connection between the alleged prejudices it suffered and Hall's inaction. According to Hall, U.S. Watermattress' actions were based instead on business considerations, the belief that the patent was invalid, and the belief that the patent would be declared invalid in the *Intex* litigation. In addition, Hall argues, the allegedly prejudicial decisions were undertaken before Hall knew or should have known of the allegedly infringing activities and thus cannot possibly be attributed to his delay. We agree, because although 1987 is the beginning of the delay period, at least for purposes of this summary judgment motion, no action is cited that has been shown to have occurred after 1987.

A review of the declarations relied on by U.S. Watermattress reveals that they all lack any indication that the reportedly missing records were lost or destroyed between 1987 and the date the suit was filed, or that the allegedly faded memories were intact before 1987 and have only faded between 1987 and 1992, or that the latest of the business expansions was planned or was undertaken after 1987. U.S. Watermattress has, as with the question of the unreasonableness of Hall's delay in bringing suit, failed to meet its burdens of production and proof, inasmuch as the only evidence put forward to substantiate its claims of prejudice fails to indicate, much less conclusively demonstrate, that the allegedly prejudicial changes in circumstance occurred after Hall knew or should have known

of the allegedly infringing activities.[5] *See Adelberg Laboratories, Inc. v. Miles, Inc.,* 921 F.2d 1267, 1272, 17 USPQ2d 1111, 1114–15 (Fed.Cir.1990) (the time period for which the patentee seeks damages is not the proper focus of the inquiry; what is crucial is the date the patentee knew or should have known of the infringement, the date the patentee brought suit, and what happened in between). By definition, actions undertaken before the delay period, however prejudicial, may not figure at all in the analysis.

For the foregoing reasons, we conclude that the district court's grant of summary judgment in favor of U.S. Watermattress on laches grounds on this record was improvident and must be vacated. Whether on a fuller record, summary judgment may or may not be proper, we cannot know. We leave to the district court to decide, should the parties so move.

*Equitable Estoppel*

■ As with laches, U.S. Watermattress bore the burdens of production and proof. Thus, U.S. Watermattress was required to prove: (a) statements or conduct that communicate something misleading; (b) actions taken in reliance on these statements; and (c) resulting prejudice. *Aukerman,* 960 F.2d at 1042–43, 22 USPQ2d at 1336–37.

*1. Misleading communication from conduct.*—The district court determined that Hall engaged in misleading conduct by mailing notice letters that threatened immediate enforcement in 1987 and then failing to follow through on those letters for over four years. Hall contends that the district court's determination was undermined by the court's reliance on actions that Hall took before he knew or should have known of the allegedly infringing activities, i.e., before 1987. Hall also contends that, because he should not be required to have sued U.S. Watermattress during the pendency of his suit with Intex, he

---

5. For example, the evidence submitted by U.S. Watermattress includes: (1) the fact that Alexander destroyed his records in 1984; (2) the fact that an individual named Michael Carpenter would have talked to a doctor about the history of a potential prior art waterbed *"in the early 1970's,"* had he been aware of the threat of a lawsuit; (3) the fact that an individual named

Theodore Nestor lost, misplaced or threw out his records sometime in the last 18 years; and (4) the fact that an individual named Dr. Alon Mintz no longer has his records from 1968–69. Yet, none of this evidence is remotely relevant to the question whether U.S. Watermattress was prejudiced due to Hall's delay in bringing suit *after* he was on notice of the allegedly infringing activity.

did not fail to follow through on this threat of enforcement in any consequential manner. Although Hall's contention regarding the district court's reliance on Hall's pre–1987 activities may have some merit, we need not decide this issue in light of our decisions on the required elements of reliance and prejudice.

 *2. Reliance.*—The district court determined that U.S. Watermattress relied on Hall's misleading action, reasoning that "it is clear that [U.S. Watermattress] would not have expanded had it thought Hall were seriously threatening litigation." Hall contends on appeal that U.S. Watermattress failed to meet its burden of production on this point, submitting *post hoc* conclusory statements that it relied on Hall's conduct rather than any undisputed contemporaneous evidence demonstrating such reliance. Hall also contends U.S. Watermattress has failed to prove it would have altered its conduct if sued earlier.

We are persuaded by Hall's arguments. As discussed above in our analysis of the district court's summary judgment in favor of U.S. Watermattress on laches grounds, U.S. Watermattress failed to provide any evidence at all to demonstrate that *any* of the alleged expansions relied on by the district court occurred during the relevant delay period. Moreover, although U.S. Watermattress submitted a conclusory declaration that Alexander relied on Hall's actions, Hall has raised a genuine issue of fact regarding U.S. Watermattress' true motivations in light of the evidence that (a) Alexander had been aware of the patent since at least 1976, (b) he was aware of the opinion of the industry that the patent was invalid, and (c) many, if not all, of the allegedly misleading actions occurred before 1987. Viewing the evidence in the light most favorable to Hall, as we must, we can only conclude that U.S. Watermattress may have acted due to its belief that the patent was invalid rather than due to any belief that Hall would not sue under the patent. On this record, had a jury found reliance on the invalidity of the patent, its verdict could not be set aside on motion for judgment as a matter of law. As a result, the district

court's determination of reliance was in error.

*3. Prejudice.*—In determining that U.S. Watermattress had adequately demonstrated prejudice for the purpose of establishing an equitable estoppel defense, the district court relied on the same factors and declarations submitted by U.S. Watermattress in support of its laches defense. As discussed above, U.S. Watermattress failed to provide sufficient evidence of prejudice because it utterly failed to demonstrate that the allegedly prejudicial events occurred after Hall knew or should have known of the allegedly infringing activities.

For the foregoing reasons, we conclude that the district court's grant of summary judgment in favor of U.S. Watermattress on equitable estoppel grounds was improvident and therefore must be vacated.

## CONCLUSION

The district court's grants of summary judgment of dismissal on grounds of laches as to all defendants save U.S. Watermattress are affirmed, and the grant of summary judgment in favor of U.S. Watermattress as to both laches and estoppel is vacated and the case remanded to the district court for further proceedings consistent with this opinion.

*AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED.*

## COSTS

Costs are awarded to Hall in the U.S. Watermattress case only.

PLAGER, Circuit Judge, concurring in the result.

In light of the summary judgment issued by the trial court and the evidence in the record before us, I concur in the result reached by this court. Laches and estoppel are not all that difficult. They are equitable defenses raised by a defendant, and ordinarily the burdens of production and persuasion are placed simply where one would expect them to be. The confusion demonstrated in this case is the result of our creation in *A.C.*

*Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020, 22 USPQ2d 1321 (Fed.Cir. 1992) (in banc), of the double-bursting bubble "presumption." That "presumption" had no warrant in law, and makes little sense. *See id.* at 1046–47, 22 USPQ2d at 1339–40 (Plager, J., concurring in part and dissenting in part). Cases like this may hasten the day when we discard it in favor of simplification of the law.