KNORR–BREMSE SYSTEME FUER
NUTZFAHRZEUGE GMBH,
Plaintiff,

v.

DANA CORPORATION,
et al., Defendants.

Civil Action No. 00–803–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 20, 2001.

---

John C. Lenahan, Jeffrey D. Sanok, Michael I. Coe, Evenson, McKeown, Edwards & Lenahan, P.L.L.C., Washington, DC, for Plaintiff.

Thomas C. Junker, Stephen D. Chace, LeClair Ryan, Alexandria, Wesley W. Whitmyer, Jr., Richard J. Basile, St Onge, Steward, Johnston & Reens, L.L.C., Stamford, CT, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ELLIS, District Judge.

In this patent infringement suit, plaintiff, a German brake manufacturer, sues three defendants for willful infringement of U.S. Patent No. 5,927,445 (the '445 patent). Initially, the suit targeted only one allegedly infringing product manufactured, sold or imported by defendants, namely the Mark II air disk brake. In the course of discovery, a second allegedly infringing product, the Mark III air disk brake, was added to the suit. Also in the course of discovery, a *Markman*[1] hearing resulted in rulings defining various disputed patent claim terms and phrases. *See Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.,* 133 F.Supp.2d 833 (E.D.Va.2001).[2] Based, in part, on these *Markman* rulings, summary judgment was entered in favor of plaintiff on the issue of infringement as to the Mark II air disk brake. Thereafter, a four-day bench trial was held during which plaintiff presented the testimony of six witnesses and defendants presented the testimony of four witnesses on various aspects of the following issues: (i) whether the Mark III air disk brake infringes claims 1–5 and 8–11 of the '445 patent, (ii) whether the '445 patent is invalid on grounds of obviousness or indefiniteness, (iii) whether defendants' use of the Mark II air disk brake amounted to willful infringement of the '445 patent, and (iv) whether the case is "exceptional" under 35 U.S.C. § 285, thus entitling the prevailing party to attorney's fees.[3]

### FINDINGS OF FACT[4]

#### I. The Parties

1. Plaintiff Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH (Knorr), a German corporation, is a leading manufacturer of air disk brakes and other products used in large commercial road vehicles.

2. Defendant Haldex Brake Products AB (Haldex AB) is a Swedish manufacturer of various components of heavy vehicle braking systems. Defendant Haldex Brake Products Corporation (Haldex Corp.) is the American affiliate of Haldex AB, with its principal place of business in Kansas City, Missouri.[5] Defendant Dana

---

1. *Markman v. Westview Instruments,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (question of disputed claim terms is a question of law).

2. The Memorandum Opinion, issued simultaneously with these Findings of Fact and Conclusions of Law, memorializes rulings made from the Bench in the course of the *Markman* hearing, held on November 27–28, 2000, and by Order dated November 28, 2000. This Memorandum Opinion is referred to throughout as *Knorr I,* 133 F.Supp.2d at ——.

3. Plaintiff did not allege willfulness as to the Mark III air disk brake and, in the course of the trial, plaintiff withdrew its request for any infringement damages attributable to the Mark III. Additionally, as determined on summary judgment, plaintiff proved no damages attributable to defendants' use, sale, offer for sale or importation of the Mark II air disk brake.

4. These findings of fact and conclusions of law are issued pursuant to Rule 52, Fed. R.Civ.P.

5. Unless otherwise noted, Haldex AB and Haldex Corp. are collectively referred to as "Haldex."

Corporation (Dana) is a manufacturer and retailer of commercial vehicle products with its principal place of business in Kalamazoo, Michigan. All three defendants are major competitors of Knorr who, in the late 1990's, entered into a joint agreement to manufacture and offer for sale an air disk brake product in the United States.

## II. The '445 Patent

3. Knorr is the owner by assignment of the '445 patent, issued by the Patent and Trademark Office (PTO) on July 27, 1999. The '445 patent, entitled "Disk Brake for Vehicles Having Insertable Actuator," claims an invention in the field of air disk brakes used in large commercial road vehicles.

4. The '445 patent represents an improvement over certain prior art air disk brakes which included a cast structure—known in the industry as a caliper—that straddled a brake disk and housed a brake application unit. A brake application unit is a mechanical device that multiplies an input force using a lever to provide a greater output force that presses brake shoes against the brake disk, thereby slowing or stopping the rotation of the vehicle wheel. The prior art air disk brake utilized a two-piece caliper. The rearward section of the two-piece caliper was formed as a separate housing cover, which, following insertion of the brake application unit, was attached to the front section of the caliper by several screws or bolts. This two-piece caliper design allowed insertion of the brake application unit into the caliper before the two caliper pieces were screwed together. In use, a force applied to the brake application unit of the prior art air disk brake is ultimately transmitted to the brake shoes, which in turn, transmits this force to the brake disk by impinging on the disk, thereby serving to slow or stop the disk's rotation and thus the rotation of the vehicle wheel. The application of the braking force to the disk causes a braking reaction force of equal magnitude to be transmitted back, first to the rearward section of the two-piece cali-

per, and then to the front section of the caliper via the sealed, screwed-on interface between the two pieces of the caliper.

5. The prior art two-piece caliper design spawned sealing and stability problems stemming from the effect of the brake reaction force on the sealed connection interface between the two caliper pieces. A search for a solution to these problems was the impetus for the invention claimed in the '445 patent. Thus, an object of this invention is to describe a caliper that does not experience sealing and stability problems associated with screwed-on housing parts, thereby enhancing the brake's operational reliability. This object is achieved in the '445 patent by describing an improvement over the prior art air disk brake that eliminates a separate rearward housing cover and uses instead a one-piece caliper that is largely closed in a rearward area, with the exception of an opening for access of an operating cylinder. Thus, the '445 patent eliminates the sealing and stability problems associated with the sealed interface between the two pieces of the prior art two-piece caliper by using a one-piece caliper that has no sealed interface. This design allows the brake reaction force to be transmitted from the brake application unit directly into the one-piece caliper, thereby eliminating the sealing and stability problems associated with the prior art two-piece caliper. Another key advantage of the invention claimed in the '445 patent is that the brake application unit, including all of its components, is capable of being inserted as a preassembled unit into the one-piece caliper, through an opening facing the brake disk. Then, once the brake application unit is inserted into this opening, the opening is simply closed with a cover plate, which is attached to the caliper by studs.

6. Figure 1 of the '445 patent, reproduced in part here and attached as Appendix A, depicts a preferred embodiment of the patent and helps illustrate the operation of an air disk brake that incorporates

the invention claimed in the '445 patent. As Figure 1 depicts, the brake application unit consists of various components, including a rotary lever, an eccentric, a bridge, a spring force, and at least one adjusting spindle provided with a pressure piece. In use, when an air disk brake is activated by an operating cylinder, the brake application unit's rotary lever is pushed along an eccentric in the direction of the bridge. This movement of the rotary lever multiplies the input force by several times and, once the movement is complete, a greater output force is directed into the bridge, causing the bridge to move toward the brake disk. The force of the bridge then activates the spring force, causing it, too, to contract in the direction of the brake disk. This contraction of the spring force, in turn, causes the pressure pieces to move in the direction of the brake disk, and ultimately, once this movement is complete, the pressure pieces impinge on the brake shoes that surround the brake disk. The brake shoes, in turn, impinge on the brake disk, thereby slowing or stopping the rotation of the disk and the attached vehicle wheel. Once the brake disk is activated, a brake reaction force equal to the braking force then flows back through the various components of the brake application unit and, in the end, is distributed throughout, and absorbed by, the one-piece caliper. For this absorption to occur, however, the brake application unit has to impinge in some fashion on the back end of the caliper. In the preferred embodiment of the '445 patent, for example, this necessary connection is achieved by the use of a supporting roller, which, in use, is secured to both the rotary lever and the back end of the one-piece caliper, thus allowing the brake reaction force to be transmitted by way of the supporting roller directly into the one-piece caliper.

7. The '445 patent consists of eleven claims, nine of which are at issue, namely claims 1–5 and 8–11. Claim 1, in particular, begins with a description of the prior art. In this regard, the prior art is described as:

[a] disk brake for, road vehicles, having a caliper which comprises a brake disk and on one side of which a brake application unit is arranged which has a rotary lever swivellable by an operating cylinder, the rotary lever being capable of acting by means of an eccentric onto a bridge which can be displaced against a spring force in the direction of the brake disk and has at least one adjusting spindle provided with a pressure piece. . . .

8. Claim 1 then adds the following improvements to the prior art air disk brake:

a) the caliper is constructed in one piece such that the section of the caliper receiving the application unit is largely closed in a rearward area facing away from the brake disk, with the exception of an opening for the access of the operating cylinder, and

b) the application unit is insertable as a preassembled unit into the caliper through the opening facing the brake disk when the caliper is removed from the brake disk.

9. Claims 2, 3, 4, 5, and 8 are dependent claims that add certain elements to the claimed invention. Claim 2 adds an element to claim 1, from which it depends, in that "the opening of the caliper facing the brake disk, when the application unit is inserted, is closed off by a closing plate which is penetrated by at least one pressure piece." Claim 4, also depending from claim 1, requires that the application unit be "joined together as a preassembled unit by means of a bow element." Claims 3 and 5, which depend, respectively, from claims 2 and 4, add the identical element that "the pressure pieces are in each case sealed off by means of bellows with respect to the closing plate penetrated by them." Finally, claim 8, which depends from claim 1, requires that the closing plate be screwed to the caliper by means of studs.

10. Claim 9 is an independent claim pertaining to assembly, requiring (i) a brake disk, (ii) a caliper and (iii) a brake

application unit, consisting of a rotary lever, an eccentric, a displaceable bridge, at least one adjusting spindle and at least one pressure piece. Like independent claim 1, claim 9 requires that the caliper be formed in one piece, with the section of ·the caliper receiving the brake application unit being substantially closed in an end area. Claim 9 also requires that the brake application unit be insertable as a preassembled unit into the caliper through an opening facing the brake disk. Claim 10, which depends from claim 9, then requires that the caliper opening be closed off by a closing plate that is penetrated by at least one pressure piece.

11. Finally, claim 11, an independent method claim, recites a three-step method for making the claimed invention: (i) forming a one-piece caliper that is largely closed in a rearward area facing away from the brake disk, (ii) preassembling a brake application unit which includes a rotary lever capable of acting [6] by an eccentric to selectively push at least one brake shoe against the brake disk, and (iii) inserting the preassembled brake application unit into the caliper through an opening facing the brake disk, and then closing this opening with a cover plate that is penetrated by a pressure piece capable of acting against at least one brake shoe.

### III. The Litigation

12. Haldex began developing air disk brakes in 1994. The first Haldex air disk brake prototype, the Mark I device, was completed sometime in late 1994. Thereafter, from 1995 through 1997, Haldex developed an alternative air disk brake design, the Mark II device, which included a one-piece caliper with a largely closed rearward area. The first prototype of the Mark II air disk brake was developed sometime in 1996.

13. In the late 1990's, Dana and Haldex entered into a joint agreement to manufacture and offer for sale an air disk brake product in the United States. From late 1997 to 1999, in connection with this joint agreement, Haldex shipped to Dana, free of charge, between 100 and 200 Mark II air disk brakes for testing purposes. Dana thereafter undertook extensive testing of the Mark II in U.S. laboratories and on U.S. test tracks and roadways. In this regard, to gain "real-world experience," Dana installed some of the Mark II air disk brakes on its in-house truck fleet, while others were installed on customer vehicles at no charge to the customers. In all, Dana equipped approximately eighteen vehicles with Mark II air disk brakes. And, although defendants jointly offered the Mark II device for sale in the United States, in the end, none were sold.

14. On May 15, 2000, Knorr filed the instant action against defendants, alleging that the Mark II air disk brake infringed the '445 patent.[7] Defendants answered the complaint, denying that the Mark II air disk brake infringed any claim of the '445 patent. They also counterclaimed for declaratory judgment, alleging invalidity of the '445 patent on grounds of obviousness and indefiniteness. Then, in the course of discovery, Haldex, in an attempt to design around the '445 patent, developed the Mark III air disk brake. Defendants introduced the Mark III air disk brake into the litigation in September 2000 by filing a motion for summary judgment of non-infringement with respect to the Mark III air disk brake. Defendants also

---

6. The '445 claims and specification repeatedly use the word "actuable" in this and other contexts. While this term is not found in various dictionaries, see, e.g., The American Heritage Dictionary of the English Language (4th ed.2000), Webster's Third New International Dictionary (1993), its plain meaning generally and in the context of the '445 claims and specification is "capable of acting."

7. In July 1999, shortly after the '445 patent issued, Knorr filed a patent infringement action against Haldex AB in the District of Duesseldorf, Germany, alleging that the Mark II air disk brake infringed the German counterpart to the '445 patent. This German litigation was the setting in which Haldex learned of the '445 patent.

moved for summary judgment of non-infringement and damages as to the Mark II air disk brake. For its part, Knorr sought summary judgment as to literal infringement of the Mark II, and as to infringement of the Mark III both literally and under the doctrine of equivalents. All parties moved for claim construction pursuant to *Markman v. Westview Instruments,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

15. Following a *Markman* hearing, the six disputed claim terms were construed as follows: (i) "caliper" was defined as "a structure composed of those housing portions that engage about the brake disk and contain a brake application unit;" (ii) "one-piece caliper" was defined as "a caliper constructed or formed as a single, integral piece;" (iii) "largely closed" and "substantially closed" were defined as "for the most part, to a large degree, or in the main closed;" (iv) "rearward area" was defined as "the area facing away from the brake disk;" (v) "application unit" was defined as "a mechanical mechanism that multiplies an input force using a lever to provide a greater output force that presses the brake shoes against the brake disk;" and (vi) "preassembled" was defined as "assembled beforehand." *See Knorr I,* 133 F.Supp.2d at 840.

16. Based, in part, on the *Markman* rulings, (i) Knorr's motion for summary judgment as to literal infringement of the Mark II air disk brake was granted,[8] (ii) defendants' motion for summary judgment as to the Mark II was granted to the extent it requested a finding of no damages, and (iii) the parties' cross motions for summary judgment as to the Mark III air disk brake were denied. *See Knorr I,* 133 F.Supp.2d at 840.

17. Remaining thereafter for trial were four issues: (i) whether the Mark III air disk brake infringes claims 1–5 and 8–11 of the '445 patent, (ii) whether the '445 patent is invalid on grounds of obviousness or indefiniteness, (iii) whether defendants' use of the Mark II air disk brake amounted to willful infringement of the '445 patent, and (iv) whether the case is "exceptional" under 35 U.S.C. § 285, thus entitling the prevailing party to attorney's fees.[9]

18. In the course of the bench trial, held on January 8–11, 2001, plaintiff presented the testimony of six witnesses in person: (1) Hans Baumgartner, an engineer with Knorr and one of the two named inventors of the '445 patent; (2) Dr. James Kirk, Knorr's expert on infringement issues;[10] (3) Wulf Hoeflich, the former head

8. Defendants' sole argument in opposition to Knorr's motion for summary judgment regarding literal infringement as to the Mark II air disk brake was that the Mark II's brake application unit includes adjustment and de-adjustment shafts that are not "preassembled" with the other components of the brake application unit, as required by the '445 patent claims. This argument failed and the Mark II air disk brake was found to infringe the '445 patent literally. *See Knorr I,* 133 F.Supp.2d at 841. Accordingly, the question of doctrine of equivalents infringement as to the Mark II was neither reached nor decided. *See Minnesota Mining and Manufacturing Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1572 (Fed.Cir.1992) (recognizing that it is unnecessary to consider infringement under the doctrine of equivalents where literal infringement exists).

9. As noted earlier, Knorr did not allege willfulness as to the Mark III air disk brake and

withdrew its request for damages as to the Mark III in the course of the trial. Also, as determined on summary judgment, plaintiff proved no monetary damages attributable to defendants' literal infringement as to the Mark II.

10. Dr. Kirk is (i) a registered professional engineer in Maryland and Ohio, (ii) a Professor Emeritus of Mechanical Engineering at the University of Maryland, where he has taught courses for over 25 years, and (iii) the president of FARE, Inc., an engineering consulting company started by Dr. Kirk in 1988. He received a Bachelor of Science degree in electrical engineering from Ohio University, a Masters of Science degree in mechanical engineering from M.I.T. and a Doctor of Science degree in mechanical engineering from M.I.T. He has published 115 technical articles and is listed in "Who's Who in the World," "Who's Who in America," "Who's Who in the East,"

of Knorr's Intellectual Property Department; (4) Oskar Flach, a member of Knorr's three-member Executive Board; (5) Laszlo Straub, Knorr's Vice President of Strategic Planning; and (6) Kenneth Cage, Knorr's expert on PTO procedures.[11] Additionally, plaintiff offered deposition testimony of seven individuals: (1) William Hoenes, the Vice President of Dana's Heavy Axle and Brake Division; (2) Brad Hicks, a former Engineering Manager and current Global Product Manager for Dana; (3) Charles Kleinhagen, the President of Haldex Corp.; (4) Nils Ake Nelander, Haldex AB's Manager for Business Development of Disk Brakes; (5) James Clark, Dana's Chief Engineer for Foundation Brakes and Wheel Equipment; (6) Randy Petresch, Haldex Corp.'s Director of Engineering; and (7) Matti Pettersson, a former member of Haldex AB's testing department and a current member of its research and development group. Defendants, in turn, presented the testimony of four witnesses in person: (1) Nils Ake Nelander; (2) Charles Kleinhagen; (3) James Clark; and (4) Henry Stoll, defendants' expert on infringement issues.[12]

Defendants also offered the testimony of Hans Baumgartner, by deposition, and Donald Dixon Johannesen, a prior art inventor, by affidavit.[13]

## IV. Infringement as to the Mark III

19. The testimony of Dr. Kirk was credible and persuasive and established by a preponderance of the evidence that every element of claims 1–5 and 8–11 of the '445 patent reads on the Mark III air disk brake. The photograph of the Mark III air disk brake attached as Appendix B helps illustrate the literal correspondence between the claims in issue and the Mark III device, as described and explained by Dr. Kirk in his trial testimony.[14]

20. Claim 1 of the '445 patent requires a disk brake for road vehicles having a caliper which comprises a brake disk and on one side of which a brake application unit is arranged which has a rotary lever swivellable by an operating cylinder. This element of claim 1 is found in the Mark III device, as the Mark III is a disk brake for road vehicles, which includes a caliper that partially surrounds a brake disk and on one side of which a brake application unit

"Who's Who in Science and Engineering," and "Who's Who in Technology." He is also a member of the American Society of Mechanical Engineers, the Society of Automotive Engineers, the American Society for Metals and various other technical societies.

11. Expert testimony on patent procedures is rarely necessary or relevant. In this instance, the admitted testimony focused sharply on whether the patent examiner assigned to review the '445 patent application properly considered the materiality of a French prior art patent listed in the '445 patent as a cited reference, and the non-cited American counterpart to this French prior art patent, in determining that the '445 patent was proper for issuance.

12. Henry Stoll is a registered Professional Engineer in Texas, and a Professor of Mechanical Engineering at Northwestern University. He received an undergraduate degree in mechanical engineering from Valparaiso University, a masters degree in mechanical engineering from the University of Michigan, and a Ph.D. in mechanical engineering from the University of Illinois at Urbana/Champaign. He has worked for over 25 years in

the area of mechanical design and product design—in the private industry, for the government and in academia. He has authored or co-authored more than 25 books or articles regarding mechanical design and he regularly teaches mechanical design courses in which disk brake design is examined in detail.

13. The parties stipulated to the admission of Johannesen's affidavit, as amended to reflect various evidentiary rulings, in lieu of live testimony.

14. The correspondence between the elements of claims 1–5 and 8–11 of the '445 patent and the Mark III are illustrated in various claim charts attached to Dr. Kirk's expert report. Additionally, the parties stipulated that most of the elements of claims 1–5 and 8–11 read on the Mark III air disk brake. See Stipulated Statement of Uncontested Facts. Indeed, the parties' dispute as to literal infringement of the Mark III air disk brake focused chiefly on the "one-piece caliper" and "largely closed in a rearward area" elements of the '445 patent claims.

is arranged which has a rotary lever swivellable by an operating cylinder.

21. Claim 1 of the '445 patent next requires that the rotary lever be capable of acting by means of an eccentric onto a bridge which can be displaced against a spring force in the direction of the brake disk. This element of claim 1 is also found in the Mark III air disk brake, as the Mark III includes a rotary lever that acts by means of an eccentric onto a displaceable bridge. Additionally, the Mark III bridge is displaced against a spring force in the direction of the brake disk, as required by claim 1.

22. Claim 1 of the '445 patent next requires that the brake application unit have at least one adjusting spindle provided with a pressure piece. This element of claim 1 is found in the Mark III device, as the Mark III brake application unit has two adjusting spindles, each provided with a pressure piece.

23. Claim 1 of the '445 patent requires that the caliper be constructed in one piece, such that the section of the caliper receiving the application unit is largely closed in a rearward area facing away from the brake disk, with the exception of an opening for access of the operating cylinder. This element of claim 1 is found in the Mark III air disk brake, as the caliper in this device is constructed as a single, integral cast piece, and the section of the Mark III caliper receiving the brake application unit is largely closed—that is, more closed than not—in a rearward area facing away from the brake disk, with the exception of an opening for access of the operating cylinder.

24. The parties hotly dispute the element of claim 1 requiring a "one-piece caliper." [15] In the course of the *Markman* hearing, the term "caliper" was defined as "a structure composed of those housing portions that engage about the brake disk and contain a brake application unit," and

the phrase "one-piece caliper" was defined as "a caliper constructed or formed as a single, integral piece." *See Knorr I*, 133 F.Supp.2d at 840. Despite defendants' arguments to the contrary, the caliper included in the Mark III air disk brake is a "one-piece caliper" within the scope of these definitions. It is undisputed that the Mark III caliper is (i) a structure, and (ii) composed of portions which engage about the brake disk and contain a brake application unit. Moreover, the portions of the Mark III caliper that engage about the brake disk and contain the brake application unit are constructed as a single, integral piece. Defendants mistakenly place great emphasis on the fact that the Mark III caliper includes a rectangular-shaped opening on its rearward area which, in use, accommodates a bearing bracket. Simply put, the relatively small opening [16] does not alter the fact that the Mark III caliper is still a single, integral structure that, on one side, surrounds a brake disk, and on the other side, contains a brake application unit. Accordingly, the presence of this rectangular opening does not remove the Mark III caliper from the scope of the definitions given to the terms "caliper" and "one-piece caliper" in the course of the *Markman* hearing.

25. Nor is it correct to argue, as defendants do, that the bearing bracket is a second caliper piece, thus making the Mark III caliper a two-piece caliper, rather than a one-piece caliper as required by the '445 patent claims. The bearing bracket is a cast piece of metal with a flange, a portion of which is machined to mate with a corresponding machined surface on the inside area of the rectangular opening located on the rearward end of the Mark III caliper. *See* Appendix B. This metal to metal contact between the bearing bracket and the caliper allows the brake reaction force to be transmitted in a rearward direction from the bearing

---

15. This dispute extends to all of the claims in issue, as all require a "one-piece caliper."

16. *See* Appendix C.

bracket into the Mark III caliper. Significantly, the bearing bracket does not house or contain the brake application unit in the Mark III air disk brake. Rather, the bearing bracket is a component of, and attached to, the brake application unit. Indeed, Haldex documents, including drawings and brochures, correctly identify the bearing bracket as a component of the brake application unit, not as a second caliper piece.

26. The parties also hotly dispute the question whether the caliper included in the Mark III air disk brake is "largely closed" in a "rearward area." In the course of the *Markman* hearing, the term "largely closed" was defined as "for the most part, to a large degree, or in the main closed" and the term "rearward area" was defined as "the area facing away from the brake disk." *See Knorr I,* 133 F.Supp.2d at 840. The credible and persuasive testimony of Dr. Kirk on the "largely closed" element of claim 1 established by a preponderance of the evidence that the Mark III one-piece caliper is "largely closed in a rearward area." [17] In essence, Dr. Kirk made three alternative assumptions concerning the meaning of the claim term "rearward area" and then demonstrated quantitatively and convincingly that the Mark III one-piece caliper is "largely closed"—that is, for the most part, to a large degree, or in the main closed—no matter which assumption is made.[18] Dr. Kirk's first assumption, and the correct one, was that the "rearward area" of the Mark III caliper includes only the back-face surface area of the portion of the caliper that accommodates the brake application unit, and not any additional side area of the caliper. This assumption is consistent with the definition given to the term "rearward area" in the course of the *Markman* hearing, which was "the area facing away from the brake disk." *See Knorr I,* 133 F.Supp.2d at 840. Applying this correct assumption regarding the term "rearward area" to the Mark III caliper, Dr. Kirk then determined quantitatively that the Mark III caliper was 73% closed in a rearward area. Thus, applying even his most conservative interpretation of the term "rearward area," namely the interpretation that included only the back-face surface area of the Mark III one-piece caliper, Dr. Kirk determined that the "rearward area" of the Mark III caliper was more than 70% closed. This percentage, as it is greater than 50%, renders the rearward area of the Mark III caliper "for the most part, to a large degree, or in the main closed," consistent with the definition given to the term "largely closed" in the course of the *Markman* hearing.[19] *See Knorr I,* 133 F.Supp.2d at 840.

17. The testimony to the contrary offered by defendants' expert, Henry Stoll, was unpersuasive. Specifically, Stoll argued that the term "rearward area," as used in the '445 patent claims and specification, refers to the interior, rather than exterior, surface of the back end of the one-piece caliper. Yet, nothing in the '445 patent claims or specification supports Stoll's interpretation of the term "rearward area." Moreover, his proposed interpretation is plainly inconsistent with the definition assigned to the term "rearward area" in the course of the *Markman* hearing. Indeed, the interior surface of the back end of the caliper is not "the area facing away from the brake disk," but rather, is the area facing the brake disk. *See Knorr I,* 133 F.Supp.2d at 840.

18. The photograph of the Mark III air disk brake attached as Appendix C helps illustrate

Dr. Kirk's conclusion in this regard. Dr. Kirk properly excluded from each of his three alternative calculations the opening located on the back end of the Mark III caliper for insertion of the operating cylinder, as required by the '445 patent claims.

19. Dr. Kirk's other two assumptions concerning what constitutes the "rearward area" of the Mark III caliper result in even higher "closed" percentages. Thus, the second alternative assumption on this element was that the "rearward area" included only the back third of the portion of the Mark III caliper that accommodates the brake application unit. Using this interpretation, Dr. Kirk determined that the Mark III caliper was 87% closed in a rearward area. Finally, Dr. Kirk assumed that the "rearward area" of the Mark III caliper was limited to the back half of the portion of the caliper that accommo-

27. Claim 1 of the '445 patent also requires that the brake application unit be insertable as a preassembled unit into the caliper through the opening facing the brake disk when the caliper is removed from the brake disk. This element of claim 1 is found in the Mark III air disk brake, as the brake application unit of the Mark III is capable of being inserted as a preassembled unit into the Mark III caliper through an opening facing the brake disk.

28. Claim 2 of the '445 patent requires that the opening of the caliper facing the brake disk, when the application unit is inserted, be closed off by a closing plate which is penetrated by at least one pressure piece. This element of claim 2 is found in the Mark III air disk brake, as the opening of the Mark III one-piece caliper facing the brake disk is closed off, after the brake application unit is inserted, by a closing plate penetrated by two pressure pieces. All of claim 2's remaining elements derive from claim 1, on which claim 2 depends, and as set forth in paragraphs 20–27, *supra*, all of the elements of claim 1 also read on the Mark III air disk brake.

29. Claim 3 of the '445 patent requires that the brake application unit include a bridge acted on by the eccentric of the rotary lever carrying two adjusting spindles, which are screwed to the brake application unit, and pressure pieces that are sealed off by means of bellows with respect to the closing plate penetrated by them. These elements of claim 3 are found in the Mark III, as the Mark III brake application unit includes a bridge which is acted on by the eccentric movement of the rotary lever carrying two adjusting spindles. These spindles, in turn, are screwed to the Mark III brake application unit and the pressure pieces in the Mark III brake application unit are sealed

off by means of bellows with respect to the closing plate penetrated by them. Claim 3's remaining elements derive from claim 2 which, in turn, depends on claim 1. As set forth in paragraphs 20–28, *supra*, all of the elements of claims 1 and 2 also read on the Mark III air disk brake.

30. Claim 4 of the '445 patent requires that the brake application unit be joined together as a preassembled unit by means of a bow element. This element of claim 4 is found in the Mark III, as the individual components of the Mark III brake application unit are preassembled and joined together by a bow element. All of claim 4's remaining elements derive from claim 1, on which claim 4 depends. As set forth in paragraphs 20–27, *supra*, all of the elements of claim 1 also read on the Mark III air disk brake.

31. Claim 5 of the '445 patent, like claim 3, requires that the brake application unit include a bridge acted on by the eccentric of the rotary lever carrying two adjusting spindles, which are screwed to the brake application unit, and pressure pieces that are sealed off by means of bellows with respect to the closing plate penetrated by them. These elements of claim 5 are found in the Mark III, as the Mark III brake application unit includes a bridge which is acted on by the eccentric of the rotary lever carrying two adjusting spindles. Additionally, the spindles are screwed to the Mark III brake application unit and the pressure pieces are sealed off by means of bellows with respect to the closing plate penetrated by them. Claim 5's remaining elements derive from claim 4 which, in turn, depends on claim 1. As set forth in paragraphs 20–27 and 30, *supra*, all of the elements of claims 1 and 4 also read on the Mark III air disk brake.

32. Claim 8 of the '445 patent requires that the closing plate be screwed to the caliper by means of studs. This element

dates the brake application unit. Given this assumption, he concluded that the Mark III caliper was 90% closed in a rearward area. But, as noted, the correct calculation is the

73% figure based only on the back-face surface area of the portion of the Mark III caliper that accommodates the brake application unit.

of claim 8 is found in the Mark III, as the Mark III closing plate is screwed to the caliper with studs. All of claim 8's remaining elements derive from claim 1, on which claim 8 depends, and as set forth in paragraphs 20–27, *supra,* all of the elements of claim 1 also read on the Mark III air disk, brake.

33. Independent claim 9 of the '445 patent, which pertains to assembly, requires (i) a brake disk, (ii) a caliper and (iii) a brake application unit with a rotary lever capable of acting by an eccentric onto a displaceable bridge with at least one adjusting spindle provided with at least one pressure piece which, in use, acts to press brake shoes against the brake disk. These elements of claim 9 are found in the Mark III, as the Mark III includes (i) a brake disk, (ii) a caliper and (iii) a brake application unit that includes a rotary lever capable of acting by an eccentric onto a displaceable bridge, and two adjusting spindles provided with pressure pieces which, in use, act to press brake shoes against the brake disk.

34. Claim 9 of the '445 patent requires that the caliper be formed in one piece, with the section of the caliper receiving the brake application unit being substantially closed in an end area facing away from the brake disk, with the exception of an opening for access of an operation member engageable with the rotary lever. These elements of claim 9 are found in the Mark III, as the Mark III caliper is formed in one piece, and the section of the caliper receiving the brake application unit is substantially closed in an end area facing away from the brake disk, with the exception of an opening for access of the operating cylinder.

35. Claim 9 of the '445 patent requires that the brake application unit be insertable as a preassembled unit into the caliper through a caliper opening facing the brake disk when in an installed, in use position. This element of claim 9 is found in the Mark III, as the Mark III brake application unit is capable of being inserted as a preassembled unit into the one-piece caliper through an opening facing the brake disk.

36. Claim 10 of the '445 patent, also pertaining to assembly, requires that the caliper opening be closed off by a closing plate when in an installed, in use position. Claim 10 also requires that the closing plate be penetrated by at least one pressure piece. These elements of claim 10 are found in the Mark III, as the opening in the Mark III caliper is closed off by a closing plate when in an installed, in use position, and the closing plate is penetrated by at least one pressure piece. All of claim 10's remaining elements derive from claim 9, on which claim 10 depends, and as set forth in paragraphs 33–35, *supra,* all of the elements of claim 9 also read on the Mark III air disk brake.

37. Claim 11 of the '445 patent pertains to a three-step method for making a disk brake assembly for vehicles of the type including a brake disk, a caliper and a brake application unit with a rotary lever capable of acting by an eccentric to selectively push at least one brake shoe against the brake disk. This element of claim 11 is found in the assembly of the Mark III air disk brake, in that the Mark III assembly involves at least three steps and pertains to a disk brake assembly for vehicles of the type including a brake disk, a caliper and a brake application unit with a rotary lever capable of acting by an eccentric to selectively push at least one brake shoe against the brake disk.

38. The first step in assembling a disk brake according to claim 11 involves forming a one piece caliper with a section for accommodating the brake application unit which is substantially closed in an end area which in use faces away from the brake disk, said end area including an opening for an actuating member to engage the rotary lever. This element of claim 11 is found in the assembly of the Mark III air disk brake, as such assembly involves forming as a single, integral piece a caliper

with a section for accommodating a brake application unit, such that (i) the caliper is substantially closed in an end area facing away from the brake disk and (ii) the end area includes an opening for an actuating member to engage the rotary lever.

39. The second step of assembling a disk brake according to claim 11 involves forming the brake application unit as a preassembled unit. This element of claim 11 is found in the assembly of the Mark III, as such assembly involves forming the brake application unit as a preassembled unit.

40. The third and final step of assembling a disk brake according to claim 11 involves inserting the preassembled brake application unit into the caliper through an insertion opening which, in use, faces the brake disk, and then closing off the insertion opening with a cover plate which is penetrated by a pressure piece capable of acting against at least one brake shoe. These elements of claim 11 are found in the assembly of the Mark III air disk brake, as such assembly involves inserting a preassembled brake application unit into the one-piece caliper through an opening facing the brake disk, and then closing the opening with a cover plate penetrated by pressure pieces capable of acting against the brake shoes.

41. Dana has purchased the Mark III in the United States; Haldex Corp. has imported, offered for sale and sold the Mark III in the United States; and Haldex AB has imported and offered for sale the Mark III in the United States.

## V. Validity of the '445 patent

### A. Obviousness

42. Defendants claim the '445 patent is invalid as being obvious in view of the prior art, offering five prior art patents, but no expert testimony, in support of this argument. Specifically, defendants offered the following prior art patents as evidence of their claim that the '445 patent is invalid as its subject matter was obvious to a person of ordinary skill in the art at the time of the invention: (i) German patent 40 32 886 (the '886 patent); (ii) French patent 2 306 372 (the '372 patent); (iii) German patent 26 14 321 (the '321 patent); (iv) U.S. Patent 5,433,298 (the '298 patent); and (v) U.S. Patent 4,109,765 (the '765 patent). Significantly, defendants offered no expert testimony or persuasive lay testimony concerning (i) the level of ordinary skill in the art at the time of the invention, (ii) the scope and content of the prior art, and (iii) the differences between the prior art and the claims at issue.

43. The '445 patent lists eighteen cited references, three of which are U.S. patent documents and the remaining fifteen are foreign patent documents. Four of the prior art patents offered by defendants—the '886 patent, the '372 patent, the '321 patent and the '298 patent—are cited references in the '445 patent. The fifth one—the U.S. '765 patent—is not a cited reference in the '445 patent. It is, however, the American counterpart to a cited foreign reference, namely, the French '372 patent. Indeed, the file wrapper lists the '765 patent as a "patent family member" to the French '372 patent.

44. According to the inventor of the '765 patent, Donald Dixon Johannesen, the '765 patent, entitled "Mechanically Actuated Disc Brake," includes a single-piece caliper that is completely closed in the end area facing away from the brake disk. Johannesen claims that most of the components for the brake application unit in the '765 patent were preassembled outside the caliper and inserted into the caliper from an opening facing the brake disk. Notwithstanding the Johannesen affidavit, the '765 patent, unlike the '445 patent, does not disclose or specify a requirement for a single-piece caliper, or that such single-piece caliper be "largely closed in a rearward area."

### B. Indefiniteness

45. Neither the '445 patent claims nor the specification disclose any specific measurements or calculations with respect to

the terms "largely closed" and "substantially closed" in a rearward area. In the course of the *Markman* hearing, these terms were given their plain meaning, which is "for the most part, to a large degree, or in the main closed." *See Knorr I,* 133 F.Supp.2d at 840. Defendants nonetheless claim the '445 patent is invalid as being indefinite given that the patent claims and the specification do not provide adequate guidance with respect to the qualitative terms "largely closed" and "substantially closed."

## VI. Willfulness as to the Mark II

46. The '445 patent issued on July 27, 1999. Shortly thereafter, Knorr filed a patent infringement action against Haldex in the District of Duesseldorf, Germany, alleging that the Mark II air disk brake infringed the German counterpart to the '445 patent, namely German patent DE 195 15 063. Knorr and Haldex held a meeting in August 1999 regarding resolution of the German patent litigation. In the course of the meeting, Knorr advised Haldex that an American counterpart to the German patent had recently issued. Haldex obtained a copy of the '445 patent at, or shortly after, the August 1999 meeting.

47. Haldex, after learning of the '445 patent, initially contacted European counsel regarding infringement and validity issues. At some point thereafter, Haldex obtained verbal opinions, and at least one written opinion, from American counsel regarding the '445 patent. The substance of these opinions, however, is not a part of this record as Haldex elected not to waive the attorney-client privilege.

48. In November 1999, Dana and Haldex displayed the Mark II air disk brake at an automotive show in Detroit, Michigan. In the course of the show, promotional literature regarding the Mark II was distributed to potential customers. Dana and Haldex displayed the Mark II

air disk brake in March 2000 at another automotive show in Louisville, Kentucky.

49. Haldex developed the Mark III air disk brake in late 1999, in a good faith, yet ultimately unsuccessful, effort to design an air disk brake that did not infringe the various claims of the '445 patent. Haldex's design-around effort focused primarily on the "one-piece caliper" and "largely closed rearward area" elements of the '445 patent claims. In other words, in designing the Mark III air disk brake, Haldex sought to design an air disk brake that did not include a one-piece caliper that was largely closed in a rearward area. Haldex's design-around effort proceeded on two faulty premises: (1) that the bearing bracket of the Mark III brake application unit was a second caliper piece, making the Mark III caliper a two-piece caliper and (2) that the opening in the Mark III caliper into which the bearing bracket fits results in the Mark III caliper not being "largely closed" in its rearward area. For the reasons set forth in paragraphs 19–41, the design-around effort fails to avoid infringement. It may also be said more succinctly that the design-around effort failed because the Haldex personnel involved were unwilling to forego the essential inventive advantages of the '445 patent. In any event, actual conversion by Haldex from the Mark II to the Mark III air disk brake was not scheduled to take place until August 2000.

50. On May 15, 2000, Knorr filed the instant litigation against defendants alleging infringement of the '445 patent by the Mark II air disk brake. Dana first learned of the '445 patent following initiation of the lawsuit, in May or June 2000. At no time thereafter did Dana obtain any legal opinions, oral or written, or conduct an independent patent search or investigation regarding the '445 patent. Instead, Dana relied exclusively on Haldex to handle any and all potential infringement issues concerning the '445 patent.[20] And,

**20.** Dana and Haldex are parties to an indemnification agreement whereby Haldex has

agreed to indemnify Dana for any legal fees,

through at least June 2000, Dana continued to generate test results from Mark II air disk brakes installed on test vehicles in the United States.

51. Haldex first disclosed the Mark III design to Dana in late July 2000. Thereafter, in the course of an August 2000 meeting between Dana and Haldex, Dana indicated that, in the event it were to receive a customer production order for air disk brakes in September 2000, the order would be filled using the Mark II design, not the Mark III design. Sometime after the August 2000 meeting between Dana and Haldex, Dana decided not to sell any Mark II air disk brakes, and notified its sales and marketing groups not to discuss with customers the specific features of the Mark II. Nonetheless, as established by the testimony of Clark and Petresch, in October 2000, Dana and Haldex displayed the Mark II air disk brake at another automotive conference, namely the annual American Trucking Association Truck Maintenance Conference in Columbus, Ohio.

52. Haldex stopped producing the Mark II device in mid-October 2000 and, later that month, Haldex shipped four Mark III air disk brakes to Dana, for a sale price of $350 each.

53. On November 28, 2000, summary judgment was granted in Knorr's favor as to literal infringement of the '445 patent by the Mark II air disk brake. Despite the entry of summary judgment in Knorr's favor, neither Haldex nor Dana ordered the test vehicles that had previously been equipped with Mark II air disk brakes to remain idle. Nor did Dana replace the Mark II air disk brakes in these test vehicles with non-infringing brakes, such as prior art air disk brakes or drum brakes. Instead, Dana decided to replace the Mark II air disk brakes in these test vehicles with Mark III air disk brakes, as soon as the Mark III devices were made available

to Dana by Haldex. Until that time, Dana opted not to interrupt service of the test vehicles, because, according to Dana, this was "the best thing for [its] customers" and anything else would be "very harmful to [its] customers."

54. As of January 10, 2001, Dana had removed the Mark II air disk brakes from approximately five of the eighteen test vehicles. Thus, as of that date, a number of vehicles equipped with Mark II devices were still being used for commercial purposes,[21] including transporting commercial goods between Dana's facilities and its customers.

## CONCLUSIONS OF LAW

### I. Infringement as to the Mark III

55. The patent statute provides, in part, that "whoever without authority makes, uses, offers to sell or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent thereof, infringes the patent." 35 U.S.C. § 271(a). As stipulated by the parties, Dana has purchased and used the Mark III in the United States, Haldex Corp. has imported, offered for sale and sold the Mark III in the United States, and Haldex AB has offered for sale and imported the Mark III into the United States.

56. A determination of patent infringement is a two-step process: The first step, a question of law, is to construe the scope of the asserted claims. *See Markman*, 517 U.S. at 384–391, 116 S.Ct. 1384; *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1581–82 (Fed.Cir.1996). The second step, a question of fact, is to compare the correctly-construed claims to the accused device to determine whether there is infringement. *See Bayer AG v. Elan Pharmaceutical Research Corp.*, 212 F.3d 1241, 1247 (Fed.Cir.2000). The patentee

expenses and/or damages incurred by Dana as a result of the instant litigation.

**21.** The record does not disclose the exact number of vehicles so equipped, except that it appears to be fewer than eighteen.

bears the burden of proving infringement by a preponderance of the evidence. *See The Kegel Co. v. AMF Bowling, Inc.,* 127 F.3d 1420, 1425 (Fed.Cir.1997).

57. Applying the properly-construed claims of the '445 patent to the Mark III air disk brake, it is clear by more than a preponderance of the evidence that each and every element of independent claims 1, 9 and 11 is found in the Mark III air disk brake. Accordingly, the Mark III air disk brake literally infringes independent claims 1, 9 and 11 of the '445 patent. Likewise, each and every element of dependent claims 2, 3, 4, 5, 8 and 10 is found in the Mark III air disk brake, and therefore, the Mark III literally infringes these dependent claims, as well.

58. Because each and every element of independent claims 1, 9 and 11 and dependant claims 2, 3, 4, 5, 8 and 10 literally reads on the Mark III air disk brake, the Mark III literally infringes the '445 patent.[22]

## II. Validity of the '445 patent

### A. Obviousness

59. A patent claim is invalid as being obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art...." *See* 35 U.S.C. § 103(a). Four factors are pertinent to a determination of obviousness: (1) the scope and content of the prior art; (2) the level of ordinary knowledge or skill in the pertinent art; (3) the differences between the claimed invention and the prior art, such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art; and (4) secondary considerations,

such as commercial success or long-felt but unsolved needs. *See Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

60. Issued patents are presumed to be valid. *See* 35 U.S.C. § 282; *Kahn v. General Motors Corp.,* 135 F.3d 1472, 1480 (Fed.Cir.1998). The presumption of validity is based on the presumption of administrative correctness of actions of the agency charged with examination of patentability. *See Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.,* 98 F.3d 1563, 1569 (Fed. Cir.1996). An alleged infringer's presentation of evidence of obviousness or a prior art reference that was not before the PTO examiner does not change the presumption of validity or standard of proof, although the alleged infringer's burden may be more or less easily carried because of this additional evidence or prior art reference. *See id.* On the other hand, "[w]hen no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references[23] and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." *Ultra–Tex Surfaces, Inc. v. Hill Brothers Chemical Co.,* 204 F.3d 1360, 1367 (Fed.Cir.2000) (quoting *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.1984)).

61. The burden of establishing invalidity on grounds of obviousness rests on the party asserting such invalidity. *See*

---

**22.** Given the finding of literal infringement, the issue of infringement under the doctrine of equivalents is neither reached nor decided. *See Minnesota Mining,* 976 F.2d at 1572 (recognizing that it is unnecessary to undergo doctrine of equivalents analysis when literal infringement has been found to exist).

**23.** Patent examiners may be, but need not be, persons of ordinary skill in the art pertaining to the patent applications they review. Yet, they certainly must be persons capable of understanding the art or technology involved in the applications they review.

35 U.S.C. § 282. And, the burden in this regard is one of clear and convincing evidence. *See Ultra–Tex*, 204 F.3d at 1367. In other words, an accused infringer alleging that a patent is invalid must overcome the statutory presumption of validity that attaches to an issued patent by proving invalidity by facts supported by clear and convincing evidence. *See id.* Obviousness is ultimately a question of law, and thus "[a]n expert's opinion on the ultimate legal conclusion [of obviousness] is neither required nor indeed 'evidence' at all." *Nutrition 21 v. United States*, 930 F.2d 867, 871 n. 2 (Fed.Cir.1991). *See also Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1564 (Fed.Cir.1988). Yet, it is equally true that, depending on the level of complexity and technology involved in the claimed invention and the prior art, expert testimony is often necessary to establish the factual predicates underlying a determination regarding obviousness, such as (i) the scope and content of the prior art, (ii) the level of ordinary knowledge or skill in the pertinent art, and (iii) the differences between the claimed invention and the prior art. *See, e.g., Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 860 (Fed.Cir.1991) (recognizing that expert witnesses are frequently necessary on questions of obviousness, to explain terminology or the general teachings of the art); *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed.Cir. 1985) (recognizing that "[obviousness] is a decision which must be made by courts because the law assigns that task to them. The function of witnesses, expert and otherwise, is to assist the court in determining and comprehending facts."); *Bott v. Four Star Corp.*, 218 U.S.P.Q. 358, 370 (E.D.Mich.1983) (recognizing that "it is important that 'detached, credible witnesses who [are] skilled in the pertinent art and who [can] attest to the "obviousness" of the [claimed invention] be introduced' "), *aff'd* ·732 F.2d 168 (Fed.Cir.1984). Yet, when the subject matter of the patent and prior art at issue is relatively simple, expert testimony on the question of obvious-

ness, including the factual predicates underlying the ultimate legal conclusion, may be unnecessary. *See Chore–Time Equipment, Inc. v. Cumberland Corp.*, 713 F.2d 774, 779 (Fed.Cir.1983) (concluding that no expert testimony was necessary on the question of obviousness when the scope and content of the prior art was easily discernable from the patent drawings and written specifications).

■ 62. These settled principles, applied here, compel the conclusion that defendants have not carried their burden of showing by clear and convincing evidence that the '445 patent is obvious in light of the prior art. Specifically, defendants have not established by clear and convincing evidence (i) the level of ordinary knowledge or skill in the pertinent art, (ii) the differences between the invention claimed in the '445 patent and the prior art and (iii) whether such differences, if any, are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. *See* 35 U.S.C. § 103(a). Nor is this a case in which the technology involved is so simple and straightforward as to render expert testimony unnecessary to establish the various factual predicates of the obviousness determination. *See Chore–Time*, 713 F.2d at 779. Further, defendants have also failed to produce any evidence indicating that the five prior art references offered in support of their obviousness argument were not considered by the PTO examiner in connection with the issuance of the '445 patent. To the contrary, each was either a cited reference to the '445 patent, or an American counterpart to a cited reference. In this regard, the affidavit of Donald Dixen Johannesen, which addressed elements of the invention claimed in the American counterpart to a cited reference, namely the French '372 patent, was not persuasive to establish that the '445 patent was obvious at the time the invention was made. Rather, the bare-bones, conclusory statements contained in the Johannesen affida-

vit, offered by defendants without further elucidation, are insufficient to overcome the presumption of validity of the '445 patent. *See* 35 U.S.C. § 282. Defendants also failed to produce any evidence of secondary considerations relevant to the question of obviousness, such as commercial success or long-felt but unsolved needs. *See Graham,* 383 U.S. at 17–18, 86 S.Ct. 684.

63. Defendants have failed to establish by clear and convincing evidence that the '445 patent is invalid on grounds of obviousness. *See Ultra–Tex,* 204 F.3d at 1367.

**B. Indefiniteness**

■ 64. Title 35 U.S.C. § 112 provides that:

> "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention. The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

Section 112 further requires that the patent specification independently describe the invention sufficiently to allow those of ordinary skill in the art to recognize the inventor had possession of the invention claimed. In other words, the written description must clearly reveal and teach what is claimed in the invention. *See Vas–Cath v. Mahurkar,* 935 F.2d 1555, 1563 (Fed.Cir.1991); 35 U.S.C. § 112.

■ 65. The burden of establishing invalidity on grounds of indefiniteness rests on the party asserting such invalidity, and the burden in this regard is one of clear and convincing evidence. *See North American Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1579 (Fed.Cir. 1993). A patent is invalid as fatally indefinite where the patent claims and specification are insufficiently precise such that they do not allow a person of ordinary skill in the art to determine whether he is infringing. *See Morton Int'l, Inc. v. Cardinal Chemical Co.,* 5 F.3d 1464, 1470 (Fed.Cir.1993). Importantly, however, technical terms are not per se indefinite when expressed in qualitative terms without numerical limits. *See Modine Mfg. Co. v. U.S. Int'l Trade Commission,* 75 F.3d 1545, 1557 (Fed.Cir.1996). To the contrary, words of degree are entirely appropriate "when serving reasonably to describe the claimed subject matter to those of skill in the field of invention, and to distinguish the claimed subject matter from the prior art." *Andrew Corp. v. Gabriel Electronics, Inc.,* 847 F.2d 819, 821 (Fed.Cir.1988). Indeed, words of degree may be used "to prevent the avoidance of infringement by minor changes that do not affect the results sought and accomplished." *C.E. Equipment Co. Inc. v. United States,* 13 U.S.P.Q.2d 1363, 1368 (Cl.Ct.1989).

■ 66. The '445 patent claims and specification adequately describe and illustrate what is claimed in the invention. *See Vas–Cath,* 935 F.2d at 1563. Defendants have failed to establish by clear and convincing evidence the level of ordinary skill in the art. Nor have they shown by clear and convincing evidence that a person of ordinary skill in the art would not be able to determine from a review of the '445 patent claims, its specification and the prior art what products would infringe the '445 patent with respect to the claim elements requiring a one-piece caliper that is "largely closed" or "substantially closed" in a rearward area. Instead, it appears that these qualitative words of degree serve adequately (i) to describe the invention to those skilled in the field, and (ii) to prevent infringers from avoiding liability by resorting to minor, immaterial changes.

67. Significantly, defendants' attempt to design around the '445 patent with the Mark III air disk brake was unsuccessful not because the '445 patent claims and specification were fatally indefinite, but rather because defendants were unwilling to relinquish the essential advantages of the '445 invention.

68. In summary, defendants have not established by clear and convincing evidence that the '445 patent is invalid on grounds of indefiniteness, *see Ultra–Tex,* 204 F.3d at 1367, sufficient to overcome the presumption of validity of the '445 patent. Accordingly, the patent is not invalid as indefinite. *See* 35 U.S.C. § 112.

### III. Willfulness as to the Mark II

69. A finding of willful infringement of a patent is determined by a totality of the circumstances surrounding the infringement. *See SRI International, Inc. v. Advanced Technology Laboratories, Inc.,* 127 F.3d 1462, 1465 (Fed.Cir.1997). Thus, the test for willfulness is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *Hall v. Aqua Queen Manufacturing, Inc.,* 93 F.3d 1548, 39 U.S.P.Q.2d 1925, 1930 (Fed.Cir.1996). Although there are no "hard and fast per se rules" with respect to a finding of willfulness, various factors are relevant to the willfulness determination, including: (i) whether the infringer deliberately copied the ideas or design of another; (ii) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed; (iii) whether the infringer engaged in inappropriate behavior in the course of the litigation; (iv) the infringer's size and financial condition; (v) the closeness of the infringement and validity issues; (vi) the duration of the infringer's misconduct; (vii) any remedial action by the infringer; (viii) the infringer's motivation for continuing infringing conduct in the face of knowledge of the patent; and (ix) whether the infringer attempted to conceal its misconduct. *See Rolls–Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 231 U.S.P.Q.185, 191 (Fed.Cir.1986); *Bott v. Four Star Corp.,* 807 F.2d 1567, 1572 (Fed.Cir.1986). Ultimately, the primary focus in a willful infringement inquiry is the infringer's intent and reasonable beliefs concerning non-infringement and patent invalidity. *See Ortho Pharmaceutical Corp. v. Smith,* 959 F.2d 936, 944 (Fed.Cir.1992).

70. "As a general matter, a potential infringer with actual notice of another's patent has an affirmative duty of care that usually requires the potential infringer to obtain competent legal advice before engaging in any activity that could infringe another's patent rights." *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1190 (Fed.Cir.1998). In this regard, where, as here, an infringer refuses to produce an exculpatory opinion of counsel in response to a charge of willful infringement, an inference may be drawn that either no opinion was obtained or, if it was, that it was an unfavorable opinion. *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1056 (Fed.Cir.1994).

71. A finding of willful infringement is proper where an accused infringer deliberately yielded to market pressures without investigating the scope of the patent. *See Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1547–48 (Fed.Cir.1984). On the other hand, an infringer's intent to design around a patent is evidence of good faith on the part of an infringer. *See Rite–Hite Corp. v. Kelley Co., Inc.,* 819 F.2d 1120, 2 U.S.P.Q.2d 1915, 1918–19 (Fed.Cir.1987).

72. A number of factors support a finding of willful infringement by all three defendants with respect to the Mark II air disk brake. First, it follows from the evidence that once defendants learned of the '445 patent, either they did not ask for opinions from competent American

counsel on issues of infringement and validity, or, if they did, that such opinions were unfavorable. *See Electro Medical Systems*, 34 F.3d at 1056. In this regard, the record reflects that Dana did not obtain any legal opinions on infringement or validity upon learning of the '445 patent, but rather, relied exclusively on Haldex to handle such issues in light of the indemnification agreement entered into between Dana and Haldex. Haldex, on the other hand, obtained legal opinions from American counsel on infringement and validity issues, but given that Haldex declined to disclose the content of such opinions, it is reasonable to conclude that such opinions were unfavorable. *See id.* Another factor that supports a finding of willful infringement as to the Mark II air disk brake is the fact that the determination of literal infringement of the '445 patent by the Mark II on summary judgment did not involve a close legal or factual question, as defendants raised only one, relatively minor and unpersuasive argument in opposition to Knorr's motion for summary judgment.[24] *See Knorr I*, 133 F.Supp.2d at 841. Yet, even after Knorr won summary judgment on the issue of infringement as to the Mark II, defendants failed to take prompt remedial action. For example, as of January 2001, a number of test vehicles that Dana had previously equipped with Mark II air disk brakes were still being used for commercial purposes. Dana has not shown convincingly that it would have suffered any exceptional hardship in immediately replacing the Mark II air disk brakes on these test vehicles with non-infringing brakes following the entry of summary judgment in Knorr's favor. Rather, it is evident from the record that Dana deliberately yielded to market pressures in deciding to continue using the infringing Mark II air disk brakes on test vehicles pending future receipt of replacement Mark III air disk brakes. Additionally, although Haldex indeed developed the Mark III air disk brake in a good faith effort to design around the '445 patent, Haldex nonetheless continued to use the Mark II air disk brake throughout the redesign effort, including displaying Mark II air disk brakes at various automotive conferences in the United States and distributing Mark II promotional literature to potential customers at these conferences. Finally, given the quantity and quality of the evidence presented by defendants at trial on the issues of obviousness and indefiniteness, it cannot fairly be said that defendants, throughout the litigation, had a good faith belief that the '445 patent would ultimately be found invalid on these grounds.

73. A totality of the circumstances compels the conclusion that defendants' use of the Mark II air disk brake, and indeed Dana's continued use of the Mark II air disk brake on various of its vehicles, amounts to willful infringement of the '445 patent.

### IV. Attorney's Fees

74. Title 35 U.S.C. § 285 authorizes the court "in exceptional cases" to award "reasonable attorney's fees to the prevailing party." 35 U.S.C. § 285. The prevailing party must establish the exceptional nature of the case by clear and convincing evidence. *See Cambridge Products, Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050 (Fed.Cir.1992). Even if this burden is met, an award of attorneys fees under § 285 remains discretionary as the trial court is in the best position to weigh the various factors that contribute to a fair allocation of the burdens of litigation. *See S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 781 F.2d 198, 201 (Fed.Cir.1986) (stating that "the trial judge is in the best position to weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of

---

**24.** Specifically, defendants argued that the brake application unit in the Mark II air disk brake includes certain adjustment and deadjustment shafts that are not "preassembled" with the other components of the brake application unit, as required by all claims of the '445 patent. *See supra,* note 8.

the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser."). Thus, determining whether attorney's fees should be awarded under § 285 is a two-step process: First, the district court must determine whether the prevailing party has established by clear and convincing evidence that the case is "exceptional," and, if so, the district court must then exercise its discretion in determining whether an award of attorney's fees is appropriate in the circumstances. *See Enzo Biochem, Inc., v. Calgene, Inc.* 188 F.3d 1362, 1370 (Fed.Cir.1999).

75. Bad faith litigation, willful infringement, or inequitable conduct are among the circumstances that may render a case "exceptional" for purposes of § 285. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1580 (Fed.Cir.1996). And, although an award of attorney's fees does not automatically follow from a finding of willful infringement, such a finding is a sufficient basis for finding the case "exceptional." *See Avia Group International, Inc., v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1567 (Fed.Cir.1988).[25] Even if a case is deemed "exceptional," however, it does not necessarily follow that attorney's fees must be awarded to the prevailing party. Rather, there are a number of factors that courts may consider in determining whether an award of attorney's fees is warranted, such as the "closeness of the case, tactics of counsel, the conduct of the parties and any other factors that may contribute to a fairer allocation of the burdens of litigation as between winner and loser." *J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1051 (Fed.Cir.1987).

76. Although there was no bad faith litigation or inequitable conduct on the part of defendants in this case, the case is appropriately deemed "exceptional" with respect to the Mark II air disk brake based on defendants' willful infringement of the '445 patent. Accordingly, the Court, in its discretion, awards attorney's fees to Knorr insofar as such fees relate to work performed in the course of the litigation in connection with the Mark II air disk brake. The case is not "exceptional," however, with respect to the Mark III air disk brake, which represents a good-faith, albeit unsuccessful, attempt by defendants to design around the '445 patent. For this reason, an award of attorney's fees is unwarranted for work performed by Knorr in the course of the litigation in connection with the Mark III air disk brake.

Appropriate orders and an injunction will issue in accordance with these Findings of Fact and Conclusions of Law.

25. Indeed, a trial court must provide reasons for not finding a case "exceptional" under § 285 when a finding of willful infringement has been made. *See Jurgens v. CBK, Ltd.,* 80 F.3d 1566, 1572 (Fed.Cir.1996); *Modine Manufacturing Co. v. Allen Group, Inc.,* 917 F.2d 538, 543 (Fed.Cir.1990) (recognizing that when a trial court denies an award of attorney's fees to the prevailing party despite a finding of willful infringement, the court must explain why the case is not "exceptional" within the meaning of § 285).

# APPENDIX A[25]

FIG.1

[25] Appendix A is a reproduction of Figure 1 of the '445 patent, depicting a preferred embodiment of the invention. For ease of reference, the names of the various components have been added to the corresponding numbers already included in the figure.

## APPENDIX B[26]

[26] Appendix B is a photograph of the Mark III air disk brake. As depicted in the photograph, the caliper has been cut along a plane in order to demonstrate the relative location of the brake application unit, with the bearing bracket attached, inside the Mark III caliper.

## APPENDIX C[27]

**Application Unit Accommodating Section (Rear View)**

Boundary

Opening (2) 8.39 in^2

Operating Cylinder Opening (1)

Inside Boundary 30.8 in^2

---

[27] Appendix C is a photograph of the "rearward area" of the Mark III air disk brake which, as shown, includes a square opening for insertion of an operating cylinder and a rectangular opening which, in use, accommodates the bearing bracket.